IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Sherry Wilson, | ) | C/A No. 3:12-1750-JFA-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| South Carolina Department of Labor, | ) | |
| Licensing, and Regulation; Catherine | ) | |
| Templeton; Samuel Wilkins; William "Ron" | ) | |
| Cook; Charles Ido; Holbrook "Rion" Alvey, *in* | ) | |
| *their official and individual capacities*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The plaintiff, Sherry Wilson ("Wilson"), filed this employment case raising claims pursuant

to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C.

§ 1983, against Defendant South Carolina Department of Labor, Licensing, and Regulation; claims

pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against the individual defendants in their official

capacities; and a state law claim of civil conspiracy against the individual defendants in their

individual capacities. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil

Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendants' motions for summary

judgment. (ECF Nos. 91, 92, 93, 94, 96, & 98.) Wilson filed responses in opposition (ECF Nos.

111, 112, 113, 114, 115 & 116; Additional Attachments, ECF Nos. 117, 118, & 121), and the

defendants filed reply memoranda (ECF Nos. 122, 123, 124, 125, 126, & 127). Having reviewed

the parties' submissions and the applicable law, the court finds that the defendants' motions should

be granted.

## BACKGROUND

The following facts are either undisputed or are viewed in the light most favorable to Wilson, to the extent they find support in the record.  The South Carolina Department of Labor, Licensing and Regulation ("LLR") is a state agency that "is responsible for all administrative, fiscal, investigative, inspectional, clerical, secretarial, and license renewal operations and activities of the boards and commissions enumerated in Section 40-1-40."  S.C. Code Ann. § 40-1-50(A).  The parties agree that there are approximately forty professional and occupational boards and commissions for which LLR is responsible.  Within LLR, the Division of Professional and Occupational Licensing ("POL") provides the administrative support to these boards and commissions.  In 2008, then-Director Adrienne Youmans reorganized the POL Division by creating a new office, the Office of Licensure and Compliance ("OLC"), to improve efficiency and accuracy.  Thus, the POL Division was divided into three offices—OLC, the Office of Board Services ("OBS"), and the Office of Investigations and Enforcement ("OIE")—with separate responsibilities.  Specifically, "OLC was responsible for processing licensure applications and assisting applicants through the licensing process[;] OBS was . . . responsible for providing direct staff support to the individual boards and commissions and their members, including scheduling, preparing for, and staffing board and commission meetings[; and] OIE was . . . responsible for investigating complaints of misconduct by licensees."  (Order of Chief Administrative Law Judge Ralph K. Anderson, III, dated Mar. 28, 2012, ECF No. 96-3 at 2-3.)[1]

---

[1] The court notes that many of the exhibits cited in this Report and Recommendation may be found as attachments to more than one motion and/or response.  For ease of reference and in light of the fact that LLR's motion includes complete versions of all the exhibits cited in this Report and Recommendation, all ECF citations to exhibits for these pending motions refer to LLR's attachments to its motion for summary judgment.



Wilson, an African-American female, began her career with LLR in 1993 working for the Board of Nursing. She has held various positions with LLR and is currently a compliance assistant. At the time of the OLC reduction in force, Wilson held the position of Program Coordinator II, a Band 5 position, for OLC.

Under the reorganization during which OLC was created, seventeen of the boards were initially transitioned to OLC, while the licensing functions of the remaining boards were to be transitioned to OLC at a future time in three or four phases. Ultimately, the transitioning of all forty boards was never completed. Prior to the creation of OLC, oversight over all licensing was performed by the boards individually or by groups of boards. The board administrators and staff assigned to each board were provided by LLR. Under OLC, board staff was performing many of the same duties, just on a different floor under the supervision of OLC.

The creation of OLC was opposed by some LLR employees and board members. Youmans recalled some board members complaining that they were not consulted prior to its creation and that many LLR employees complained about being reassigned to OLC. After its creation, OLC began organizing and processing the boards' paperwork. As a result, according to Wilson, OLC discovered incomplete and unprocessed applications and compliance issues, and in one instance an OLC employee discovered over thirty thousand dollars in uncashed checks for license fees.

In June 2010, a legislator provided Youmans with a copy of an anonymous letter—which discovery revealed was drafted by two employees of LLR, Janet Baumberger and Tracy Gunter—alleging problems with OLC. Youmans found the letter to be full of lies, rumors, and innuendos and believed it had racial overtones because it raised issues with two African-American employees. Youmans did not act on the letter. This letter was also sent to members of the General

Assembly and the Legislative Audit Council.  Representative William E. Sandifer, III, the Chairman

of the Labor, Commerce and Industry Committee, testified that he initially took no action on this

letter but when it became apparent that other legislators desired action, at least one subcommittee

hearing was held where Youmans was questioned about OLC including the duties of David

Christian, III[2] and his salary.[3]  Subsequently, on June 15, 2010, Representative Sandifer authored a

letter to the Legislative Audit Council that was signed by twenty-seven legislators requesting an audit

of LLR.[4]  Wilson, Youmans, and others believe that these actions were racially motivated.

        In November of 2010, Representative Nikki Haley was elected Governor of South Carolina

and on December 8, 2010, Governor-elect Haley held a press conference announcing Catherine

Templeton as her choice to succeed Youmans as Director of LLR.  During the press conference

announcing her appointment, Templeton expressed that LLR was to be a support agency for the

individual boards and she intended to bring LLR back to the way it was before and stated, "[t]here's

not any question that the POL Division or the Professional and Occupational Licensing boards

. . . needs to be cleaned up."  (Templeton Dep. 143, ECF No. 96-20 at 37.)  Templeton indicated that

---

    [2] Christian is the plaintiff in a related case, C/A/ No. 3:12-cv-1382-JFA-PJG.  At the time of the OLC reduction in force, Christian held the position of Program Manager II or Assistant Deputy Director of OLC.

    [3] Sandifer also indicated that the complaints to the General Assembly reached the point that several legislators proposed removing some of the boards from LLR.  (Sandifer Dep. 36-38; 42-47, ECF No. 96-19 at 10-11, 12-13.)

    [4] The audit, which was completed after the reduction in force of OLC, reported that almost all of the POL management staff outside of OLC and seven of the eight board administrators interviewed "expressed displeasure in the fashion that OLC was implemented and presented to the Agency" and "shared frustration with the poor quality of service that the licensing applicants received."  (LAC Audit at 22-23, ECF No. 96-2 at 28-29).  Wilson disagrees with these findings.



during her meeting prior to the press conference, Haley characterized LLR as "corrupt" and "struggling" and expressed concern over the delays in licensing.[5] (Id. at 127, ECF No. 96-20 at 33.)

Following the announcement and continuing after her confirmation as Director of LLR, Templeton held many meetings with an administrators, board members, and employees of LLR. Prior to her confirmation, Templeton stated that she had spoken with Representative Sandifer, Bobby Creech from the Accountancy board, and Louis Costa from the Medical board; she also met with LLR employees Jim Knight and Rion Alvey, and spoke with Youmans.

After transitioning as director, Templeton ultimately decided that although the theory of colonizing the licensing function was not a bad idea, in practice it was "a horrible failure" and was probably the reason that the licensing process had slowed down significantly or was not happening at all. (Templeton Dep. 152, ECF No. 96-20 at 39.) Templeton determined that the employees that were under the boards doing licensure and compliance functions needed to go back under the boards. After she reached that determination, Templeton sought input from Lynn Rivers (LLR Human Resources Director), Sam Wilkins (State Human Resources Director), Heather Pope (a manager with the State Human Resources Division), and outside counsel. (Templeton Dep. 417-18, ECF No. 96-20 at 106; see also id. at 410, ECF No. 96-20 at 104.) On February 16, 2011, Wilson along with other OLC staff met with Templeton and Rivers at which time she was informed that OLC staff would all be terminated and rehired. During a March 2, 2011 meeting with Templeton, Wilson

---

[5] Wilson stresses that when asked why she did not question what was "corrupt," Templeton testified: "I was sitting in the office with the governor elect of South Carolina having committed to her that I would help her do what she needed done. Whatever that, you know, whatever missions we needed to accomplish and there was a bank of press waiting, that wasn't the time to start backtracking." (Templeton Dep. 128-29, ECF No. 96-20 at 33-34).



testified that she was informed that Templeton was not going to do anything to her department. Additionally during this time, in February 2011, Bryant was asked to retire in February 2011.[6]

The OLC reduction in force ("RIF") was one of three LLR RIFs approved on March 10, 2011, which was outlined by a RIF plan. The other RIFs were for the Customer Call Center and an administrative unit in OBS. LLR's RIF policy requires LLR to select a "competitive area" for the RIF, which is the area from which employees are selected for layoff. Pursuant to the RIF Plan, employees are ranked for layoff by "retention points" that are computed using various factors, including years of service and performance. Employees may have rights to "bump" or displace other employees within the competitive area but may not displace employees outside the competitive area. Also, employees have recall rights to positions that become available within their competitive area; however, they do not have preferential hiring rights for jobs that open elsewhere. If an employee is rehired within twelve months, he or she retains state seniority. Notably, the competitive area for the OLC RIF was all of OLC because it was being eliminated.

The OLC RIF Plan was drafted and submitted to the South Carolina Budget and Control Board to be approved for "procedural correctness," which involves reviewing "whether the plan seems to conform with the requirements of the [RIF] policy." (Wilkins Dep. 28, ECF No. 96-21 at 9.) The OLC RIF Plan was approved and included a total of sixty employees, of which twelve were probationary and temporary employees, rehired retired employees, and TERI employees. This left forty-eight OLC employees involved in the layoff. LLR calculated retention points for the forty-

---

[6] Relying on Alvey's testimony, Wilson suggests that "Templeton wanted to cut ties with [Bryant] because of a federal investigation involving OBS employees." (Pl.'s Mem. Opp'n Summ. J. at 10, ECF Nos. 111, 112, 113, 114, 115, & 116 at 10) (citing Alvey Dep. 98-101). Wilson argues that OLC oversight identified the issue that was the subject of the investigation, which previously had gone unnoticed.



eight employees to select those who would be offered open administrative positions in OBS following the RIF. All permanent employees of OLC, save four, were offered Administrative Assistant positions performing licensing or compliance functions with the various boards, a position listed at a Band 4 pay level. (See generally OLC RIF Plan, ECF No. 96-6.)

The RIF Plan lists the race, gender, and age of the covered employees and, pertinent here, reveals that of the forty-eight covered employees, twelve are white, thirty-two are African-American, and four are listed as "other." The other two RIFs approved on the same day indicated that all four terminated individuals in the OBS administrative section are white and that five of the individuals terminated in the Customer Call Center are white and five are African-American.

For Wilson (at Band 5) and several others, an administrative assistant position would entail making less money but involve no loss of seniority or benefits and included eligibility to apply to other posted positions at LLR. In March 2011, Wilson applied for an administrative manager I position. A panel consisting of Alvey and Assistant General Counsel Lynne Rogers screened the initial applicants and interviewed the three most qualified applicants. The position was ultimately awarded to Dorothy Buchanan.

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible



evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." <u>Ballinger v. N.C. Agric. Extension Serv.</u>, 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. <u>Id.</u> at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. <u>Dennis v. Columbia Colleton Med. Ctr., Inc.</u>, 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. <u>See id.</u> at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

## B.    Plaintiff's Claims

### 1.    Claims of Civil Conspiracy Pursuant to 42 U.S.C. § 1983 and § 1985

Wilson asserts claims of civil conspiracy pursuant to 42 U.S.C. § 1983 and § 1985 seeking monetary relief against the individual defendants only in their official capacities. However, the



Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities."). As arms of the state, these defendants, who were all employees of state agencies, are entitled to sovereign immunity and cannot constitute "persons" under § 1983 in that capacity. See Will, 491 U.S. at 70-71. Although a State may waive sovereign immunity, Lapides v. Board of Regents, 535 U.S. 613 (2002), the State of South Carolina has specifically denied this waiver for suit in federal district court. See S.C. Code Ann. § 15-78-20(e). Accordingly, these defendants are immune from suit with regard to these claims. See Will, 491 U.S. at 70-71; see also Quern v. Jordan, 440 U.S. 332, 343 (1979) (recognizing that Congress did not override the Eleventh Amendment when it created the remedy found in 42 U.S.C. § 1983 for civil rights violations). Therefore, the individual defendants are entitled to summary judgment on these claims.

### 2.    Claim of State Law Civil Conspiracy

Wilson also asserts a claim of civil conspiracy under state law against the individual defendants in their individual capacities. Under South Carolina law, "[a] civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage



to the plaintiff." <u>McMillan v. Oconee Mem'l Hosp., Inc.</u>, 626 S.E.2d 884, 886 (S.C. 2006); <u>see also</u> <u>Pye v. Estate of Fox</u>, 633 S.E.2d 505, 511 (S.C. 2006) (listing the three elements of a civil conspiracy). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint," and "because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other cause of action." <u>Hackworth v. Greywood at Hammett, LLC</u>, 682 S.E.2d 871, 874 (S.C. 2009) (internal citations omitted). Finally, pursuant to South Carolina law, with regard to any civil conspiracy claim pending between July 1, 2014 and June 30, 2015 that is based upon a personnel or employment action or decision regarding a plaintiff employee, a government employee named as a defendant is immune from suit from such a claim if the court finds that the defendant government employee was acting within the scope of his or her official duties. <u>See</u> S.C. 2014-2015 Appropriation Bill, Act No. 286, H. 4701, Proviso 117.92 (eff. July 1, 2014).

The defendants present several reasons that they are each entitled to summary judgment on this claim. Upon thorough review of the parties's filings and the applicable law, the court agrees. No reasonable jury could find a conspiracy based on the evidence presented.[7] Specifically, despite the voluminous record in this case, in response to the defendants' well supported motions, Wilson relies upon the identical evidence to support her race discrimination and failure to promote claims

---

[7] Although Wilson points out in her response to the defendants' summary judgment motions that the court previously ruled that Wilson had adequately pled a state law claim of civil conspiracy, that ruling regarding Defendant Templeton's Rule 12(b)(6) motion does not avail her at the summary judgment stage, where she is required to actually present proof supporting her allegations. <u>See</u>, <u>e.g.</u>, <u>Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.</u>, 202 F. Supp. 2d 431, 436 (M.D.N.C. 2002) (stating that "a Rule 12(b)(6) motion has a different standard of review than a summary judgment motion" and observing that a court's ruling denying a moving party's motion to dismiss a claim does not prevent the moving party from challenging the sufficiency of the claim again through a summary judgment motion at the appropriate phase of the litigation).



against LLR as she does to support her claims of conspiracy. (See generally Pl.'s Resp. Opp'n LLR's Mot. Summ. J., ECF No. 111.)  Moreover, Wilson has failed to point or otherwise provide evidence of any special damages she purportedly suffered due to the individual defendants' actions which are beyond the alleged damages she purportedly suffered as a result of her claims pursuant to Title VII against LLR.  See, e.g., Vaught v. Waites, 387 S.E.2d 91 (S.C. Ct. App. 1989) (finding no genuine issue of material fact where Plaintiff's testimony was contrary to the allegations of an overt act in the Complaint); see also Hackworth,  682 S.E.2d at 874.  Finally, despite her speculative and conclusory allegations to the contrary, Wilson has not made any showing that the individual defendants acted outside the scope of their official duties; thus, they are immune from Wilson's claim.  See S.C. 2014-2015 Appropriation Bill, Act No. 286, H. 4701, Proviso 117.92; S.C. Code Ann. § 15-78-30(I) (defining "scope of official duty").  Accordingly, her civil conspiracy claim against the individual defendants fails as a matter of law.

### 3.    Title VII Claims

#### i.    Avenues of Proof in Employment Cases

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof.  First, she may establish her claims by presenting "present sufficient evidence, direct or circumstantial, 'for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice.' " Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc) (quoting Desert Palace Inc. v. Costa, 539 U.S. 90 (2003)).

Alternatively, a plaintiff may rely on circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework.  Warch v. Ohio Casualty Ins. Co., 435 F.3d 510,



520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer



unlawfully discriminated." <u>Reeves</u>, 530 U.S. at 148.  However, "if the record conclusively reveal[s]

some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only

a weak issue of fact as to whether the employer's reason was untrue and there was abundant and

uncontroverted independent evidence that no discrimination had occurred," summary judgment is

appropriate.  <u>Id.</u>  Accordingly, the court must evaluate "the strength of the plaintiff's prima facie

case, the probative value of the proof that the employer's explanation is false, and any other evidence

that supports the employer's case and that properly may be considered on a motion for judgment as

a matter of law."  <u>Id.</u> at 148-49.

    Importantly,

> [r]egardless of the type of evidence offered by a plaintiff as support for her
> discrimination claim (direct, circumstantial, or evidence of pretext), or whether she
> proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in
> every employment discrimination case involving a claim of disparate treatment is
> whether the plaintiff was the victim of intentional discrimination." <u>Reeves</u>, 530 U.S.
> at 153 (2000); <u>see</u> <u>Burdine</u>, 450 U.S. at 256.  To demonstrate such an intent to
> discriminate on the part of the employer, an individual alleging disparate treatment
> based upon a protected trait must produce sufficient evidence upon which one could
> find that "the protected trait . . . actually motivated the employer's decision."
> <u>Reeves</u>, 530 U.S. at 141 (internal quotation marks omitted).  The protected trait
> "must have actually played a role in the employer's decisionmaking process and had
> a determinative influence on the outcome."  <u>Id.</u> (internal quotation marks and
> alterations omitted); <u>cf.</u> <u>Price Waterhouse</u>, 490 U.S. at 277 (O'Connor, J.,
> concurring) (noting that "statements by nondecisionmakers, or statements by
> decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the
> plaintiff's burden" of proving discrimination); <u>Koski v. Standex Int'l Corp.</u>, 307 F.3d
> 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the
> decisionmaker, as opposed to other managers or subordinates, evaluated the
> aggrieved employee based upon discriminatory criteria).

<u>Hill</u>, 354 F.3d at 286; <u>see also</u> <u>Merritt</u>, 601 F.3d at 294-95 ("Notwithstanding the intricacies of proof

schemes, the core of every [discrimination] case remains the same, necessitating resolution of the

ultimate question of . . . whether the plaintiff was the victim of intentional discrimination.").



### ii.    Reduction in Force

Under either avenue of proof, for the reasons that follow the court finds that the defendants are entitled to summary judgment on this claim.[8]  Specifically, no reasonable jury could find based on the record before the court that Wilson was the victim of intentional discrimination.  Moreover, with regard to the <u>McDonnell Douglas</u> burden-shifting framework, assuming arguendo that Wilson has established a *prima facie* case, the court finds that LLR has offered a legitimate, nondiscriminatory reason for the RIF, which Wilson has failed to demonstrate was a pretext for discrimination.

As summarized above, the evidence reveals that Templeton, as the new director of LLR, decided to reorganize LLR based on numerous complaints that the licensing arm was not functioning properly.  Ultimately, LLR conducted a RIF that eliminated the recently created OLC, which Templeton believed was the appropriate way to accomplish the reorganization of the functions of OLC.[9]  Therefore, the court finds that LLR has presented a legitimate, nondiscriminatory reason for the OLC RIF.

Despite extensive discovery and a voluminous record before the court, Wilson has failed to demonstrate that LLR's reason for laying off Wilson was pretextual or that Wilson was the victim

---

[8] The court's discussion in this section is equally applicable whether Wilson's claim is analyzed as challenging her termination as a result of the RIF or alleging a disparate impact as a result of the RIF, to the extent that she even properly raised such a claim.

[9] Wilson's administrative challenges to the RIF were unavailing.  The Honorable Ralph K. Anderson, III, Chief Judge of the South Carolina Administrative Law Court, affirmed the South Carolina Budget and Control Board's determination that LLR properly or consistently applied its RIF policy with regard to Wilson in conducting the OLC RIF.  (<u>See</u> <u>generally</u> ECF No. 96-3.)



of intentional discrimination.[10]   The majority of Wilson's support for her position that LLR used a forbidden consideration in making its decision consists of conclusory or speculative allegations or testimony from individuals who felt or believed, without any support, that the actions were racially motivated.   See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case.") (internal quotation marks omitted).  For example, Wilson argues that the stated reasons for the RIF are implausible, relying on Templeton's appointment speech that indicated that she would eliminate OLC, that the evidence shows Templeton met with other individuals about OLC, that Alvey indicated to Christian that Templeton was carrying out orders to remove OLC and Christian, that the transition team did not contact Youmans before Templeton's confirmation, that there was not a financial reason for the RIF, and how quickly the RIF occurred after Templeton was confirmed.  Wilson fails to explain, however, how any of these facts, even if true, undermine the stated reason for the RIF.

Wilson also relies on testimony from several individuals (some of whom filed related actions) who believed the RIF was racially motivated and that African Americans had difficulty advancing within LLR.  She argues, without support, that OBS should have been included in the RIF, but that the RIF was limited to OLC to protect the white management within OBS and hide the racial motivations.  These arguments consist wholly of speculation, subjective belief, and rumors which are insufficient to establish a claim of race discrimination.  See Thompson, 312 F.3d at 649; Mitchell v. Toledo Hospital, 964 F.2d 577, 584-85 (6th Cir. 1992) (finding that even considering a hearsay

---

[10] This discussion and analysis also applies to Wilson's claims alleging LLR violated Title VII in failing to promote her.

Page 15 of  22



affidavit, "the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). Similarly, as pointed out by LLR, much of the "evidence" that Wilson relies on is not presented in a form that would be admissible evidence.[11] See Fed. R. Civ. P. 56(c).

Wilson's argument that it is also implausible that OLC was not as efficient as the old system is similarly unavailing. This argument appears to be based on selective opinions about OLC. Wilson argues that OLC provided oversight, pointing out an instance in which an OLC employee discovered over thirty-thousand dollars in uncashed checks for license fees and that OLC spent substantial time organizing and processing paperwork that had not been properly handled. Contrary to Wilson's belief of implausibility, the record reveals ample evidence that others disagreed with her opinion. As argued by LLR, "[i]t is undisputed that there was an enormous practical and political battle over whether OLC was the appropriate approach [to most efficiently handle licensing and compliance]. Plaintiff lost the battle when Templeton, as a new Director, decided to abolish OLC. Reassigning the functions of OLC was one of several perfectly reasonable business-related alternatives available to her." (LLR's Reply Supp. Summ. J. at 8, ECF No. 123 at 8.) Moreover, even if LLR's decision was unwise or incorrect, Wilson has failed to produce any evidence that the reason was a pretext for race discrimination. See DeJarnette v. Corning, Inc., 133 F.3d 293, 298-99 (4th Cir. 1998) (stating that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer" and that "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination") (internal quotation

---

[11] To the extent that Wilson relies on allegations that Cook made racially charged comments in the workplace and circulated an inappropriate and allegedly racist video, there is no evidence in the record from a jury could find Cook was involved in the OLC RIF decision.



marks and citations omitted); Henson v. Liggett Corp., 61 F.3d 270, 277 (4th Cir. 1995) (ADEA) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including work place reorganization, as long as the employer does not [discriminate].").

Wilson also appears to argue discriminatory intent in that many positions at LLR are obtained through preselection, and pointing to examples of the allegedly preselected individuals who are white. However, Wilson has provided no proof that the alleged preselections were racially motivated. The law is well settled that preselection of a candidate for a position, without proof that the preselection was racially motivated, does not violate Title VII. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 271 (4th Cir. 2005) (holding that evidence that a supervisor preselected an employee for promotion is insufficient for a jury to conclude that the employer's explanation was a pretext for race discrimination); Jackson v. Winter, 497 F. Supp. 2d 759, 770 (4th Cir. 2007) ("Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination."). As the United States Court of Appeals for the Fourth Circuit has noted, evidence of preselection is not probative of discriminatory intent because it "work[s] to the detriment of all applicants for the job, black and white alike." Blue v. U.S. Dep't of the Army, 914 F.2d 525, 541 (4th Cir. 1990). Even viewing this argument with those discussed above, Wilson has failed to demonstrate LLR's actions were pretextual.

Finally, Wilson focuses on the percentage of the individuals subjected to the OLC RIF that are African American and the percentage of African Americans in the OLC management holding Band 5 or higher positions that were offered lower-paying administrative assistant positions.



Specifically, Wilson points out that two-thirds of the employees within OLC were African American and two-thirds of the employees within OLC that were earning a salary above Band 4 were African American to support her contention that the elimination of OLC was racially motivated. However, statistics without context are insufficient to show pretext. See Carter v. Ball, 33 F.3d 450, 457 (4th Cir. 1994) (stating that judges may disregard statistical evidence offered without expert testimony as to the methodology or relevance to the plaintiff's claim); see also Vaughan v. MetraHealth Cos., Inc., 145 F.3d 197, 203 (4th Cir. 1998), overruled in part on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); see generally Moultrie v. Martin, 690 F.2d 1078, 1082-83 (4th Cir. 1982) (discussing the appropriate statistical methodology to use when drawing conclusions from statistical evidence).

Accordingly, based on all of the foregoing, Wilson cannot show on the record before the court a reasonable inference that LLR's proffered reason for conducting the OLC RIF and terminating Wilson was pretextual. Moreover, even if Wilson's evidence were found sufficient to reject LLR's explanation, the court concludes that based on the evidence in the record, no reasonable jury could find that the OLC RIF and Wilson's termination was discriminatory. See Reeves, 530 U.S. at 148. Wilson cannot ultimately prove that she was the victim of intentional discrimination. See Merritt, 601 F.3d at 294-95.

### iii.    Failure to Promote

Similarly, LLR is entitled to summary judgment on Wilson's failure-to-promote claim. As stated above, in March 2011, Wilson applied for an administrative manager I position for which she was not selected. Alvey (white male) and Rogers (African-American female) screened the initial applicants and interviewed three applicants that they felt were most qualified. Ultimately, Alvey and

Rogers selected Dorothy Buchanan for the position because they determined she was the most qualified candidate.

Alvey attests that LLR did not consider Wilson for the position because she was being investigated for misconduct during the interim interview process.[12]  (Alvey Aff., ECF No. 96-10.) Alvey and Rogers determined that Wilson's alleged misconduct caused them to question her judgment and they felt it inappropriate to consider promoting Wilson.  The alleged misconduct occurred after the RIF was announced when Wilson was seen removing a large number of files and other materials, which appeared to be state property, from a rolling cart from the agency's headquarters.  When requested, Wilson returned the property.  Management, including Alvey, reviewed the returned items and determined that many of the items were agency property and should not have been removed.  Wilson was ultimately reprimand for this conduct.  (Wilson Dep. 99-100, ECF No. 96-22 at 25; Alvey Aff. ¶¶ 11-12, ECF No. 96-10 at 4.)

Therefore, assuming as LLR has that Wilson can meet the *prima facie* test for this claim, the court finds based on the foregoing that LLR has offered a legitimate, nondiscriminatory reason for interviewing and ultimately selecting another candidate over Wilson for this position, *i.e.* that the other candidate was better qualified.  Wilson cannot establish that LLR's stated reason was a pretext for race discrimination.

"A plaintiff alleging a failure to promote can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." <u>Heiko v. Colombo Savings Bank, F.S.B.</u>, 434 F.3d 249, 259 (4th Cir.

---

[12] Wilson was originally scheduled for an interview, but it was canceled.



2006).   In assessing relative qualifications, it is based on the criteria that the employer has established as relevant to the position in question.   Id.

> When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer.  But where . . . the plaintiff has made a strong showing that [her] qualifications are demonstrably superior, [s]he has provided sufficient evidence that the employer's explanation may be pretext for discrimination.

Id. at 261-62 (internal citations omitted).

Wilson argues that LLR's proffered reason is pretext for race discrimination because (1) the materials she took consisted of personal files from her office and that she took them because she believed Cook and others were trying to sabotage her, (2) she returned the property to avoid any issues, and (3) she believes Buchanan was preselected because she saw Buchanan leaving Templeton's office.  She also argues that Alvey and Rogers could have proceeded with the interview while the investigation was pending and made the determination at a later time if she was selected for the position.  The court finds these arguments do not demonstrate pretext.  Wilson's arguments in no way undermine LLR's stated reasons for canceling the interview or awarding the position to Buchanan.  Based on the evidence in the record, no reasonable jury could conclude that LLR's failure to promote Wilson to this position was discriminatory or that she was the victim of intentional discrimination.  See Reeves, 530 U.S. at 148; Merritt, 601 F.3d at 294-95.

**4.    Section 1983 Claim Against Defendant LLR**

With regard to Wilson's claim that LLR violated 42 U.S.C. § 1983, LLR argues that it is immune from suit under the Eleventh Amendment.  The agrees and observes that Wilson offers no

Page 20 of  22

opposition and appears to have abandoned this claim.  Therefore, Defendant LLR's motion should be granted.

## RECOMMENDATION

In essence, Wilson cannot establish that she was the victim of unlawful discrimination or conspiracy rather than a victim of adverse politics or circumstances.  All of Wilson's claims fail as a matter of law.  The court therefore recommends that the defendants' motions for summary judgment (ECF Nos. 91, 92, 93, 94, 96, & 98) be granted.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

August 11, 2014
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).